IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 23, 2017 Session

## STATE OF TENNESSEE v. JABRIEL LINZY, ALIAS

**Appeal from the Criminal Court for Knox County**
**No. 104488          G. Scott Green, Judge**

_____

### No. E2016-01052-CCA-R3-CD

_____

The Defendant, Jabriel Linzy, alias, appeals as of right from his convictions for first degree murder, attempted first degree murder, and employment of a firearm during the commission of a dangerous felony. The Defendant argues (1) that there was insufficient evidence to support his convictions, and (2) that evidence from social media posts was improperly admitted. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Christopher M. Rodgers, Knoxville, Tennessee, for the Defendant, Jabriel Linzy, alias.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Charme P. Allen, District Attorney General; and TaKisha M. Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

This case arose after a shooting occurred at Walter P. Taylor Homes apartment complex (Walter P.) on October 3, 2014, resulting in the death of the victim, Dominique Johnson. Devonte Blair was sitting next to the victim on an apartment porch when a vehicle stopped in front of the apartment, and a man began firing a gun at the two men. The Knox County Grand Jury charged the Defendant with one count of first degree murder, one count of attempted first degree murder, and one count of employing a firearm during the commission of a dangerous felony. See Tenn. Code Ann. §§ 39-12-

101(a)(3), -13-202, & -17-1324(b). The case proceeded to a jury trial on October 26, 2015.

## I. Pre-Trial Motion

In a pre-trial motion, the defense explained that the State planned to introduce evidence of "some kind of beef or argument on Twitter or Facebook" between the Defendant and the victim. The Defendant argued that it was not possible to authenticate comments on Facebook or Twitter.[1] Specifically, the Defendant argued, "Even if you had someone from Twitter or Facebook here to associate that particular account with an email, you would have to associate that email with the individual and that still doesn't" lay the proper foundation. To stress the difficulty of authenticating a Facebook or Twitter comment, defense counsel presented the following hypothetical:

> [I]f I left my [cellular] phone lying here or this computer lying here and the device keeps me logged in to Facebook, any employee in this city-county building could come up here and post as me on Facebook. Don't tell anybody that, but that could happen because it recognizes devices. If someone borrows someone else's phone and goes on Facebook and logs in and doesn't log out, they stay logged in, so when that person has the phone, anybody could be posting as that person. I just don't see how you can possibly authenticate a post on Facebook and link it to any particular individual.

Counsel for the State responded that she believed she could lay the proper foundation for the Facebook and Twitter comments. She claimed that she would call witnesses to introduce the Twitter records and to authenticate the Twitter and Facebook comments. The trial court reserved judgment on the issue in order to determine "what kind of foundation" the State would lay.

## II. Trial

At trial, the following testimony took place outside the presence of the jury to determine whether testimony regarding the evidence obtained through social media should be admitted. Devonte Blair testified that prior to October 3, 2014, he was familiar with the victim and that he was aware that the victim was a member of a gang called the "Four Hundred." Mr. Blair testified that prior to October 3, 2014, he was aware that the

---

[1] The Defendant also argued that the evidence from Twitter or Facebook would be hearsay; however, he does not raise this issue on appeal and concedes in his brief that the comments were not hearsay.

Defendant was a member of the "Crips" gang, but he was unsure to which "set" the Defendant belonged.

Mr. Blair affirmed that he was aware of the relationship between the victim and the Defendant and described it as follows: "I mean, they had a beef going on." When asked how "the beef" was communicated, he responded that it was through communications between the victim and the Defendant "on Facebook and Twitter." Mr. Blair explained that he did not know the nature of the conflict between the victim and the Defendant and that he had not seen the posts on Facebook and Twitter himself. He stated that he found out about "the beef" because "a friend" took a "screen-shot" of the posts and sent it to him via a message on his phone. Mr. Blair testified that he was able to identify both the victim's and the Defendant's individual Facebook and Twitter accounts by the "profile picture" associated with each account. Furthermore, he explained that he was aware that the victim's Twitter name was "DOMO_400" and that the Defendant's Twitter name was "RG_LOCO."

On cross-examination, Mr. Blair explained that the posts contained "little animosity stuff," such as "stuff like trying to fight." Mr. Blair confirmed that the posts appeared to contain an "argument" between the victim and the Defendant and that there were "threats."

Following Mr. Blair's testimony, the trial court asked defense counsel to reiterate the basis for objecting to this testimony regarding the screenshots. Counsel for the Defendant responded that the posts were impossible to authenticate:

> It's a [social media] post possibly by someone that can't authenticate who the person is that posted to – just because someone's picture is on it doesn't mean that they're the one who is posting it or that it's actually their account, and we go one step farther in that we're not watching a live feed where they're posting back and forth. Somebody took a screenshot of a supposed argument between somebody and then messaged it to somebody else. I just don't see how there's any foundation for reliability of who those accounts belonged to and who posted it, outside of the profile picture.

Defense counsel emphasized that anyone "can create an account with somebody else's name" and "find a picture online and post it." The trial court ruled that the evidence being presented before the court was admissible and reasoned as follows:

> Obviously it's a question of weight that's to be given [to the evidence], and [defense counsel] can effectively cross-examine and/or argue how anybody can create a screenshot. But if there is a picture of [the Defendant] with some derogatory or threatening comment associated with the victim in the

case for which he is on trial for homicide, that is relevant [and] admissible and it's coming in.

The jury was brought back into the courtroom, and Devonte Blair testified that he had known the victim from attending the same middle school and growing up in the Walter P. neighborhood in East Knoxville. Mr. Blair viewed and identified a photograph of the victim's body on the ground in front of an apartment. Mr. Blair confirmed that the victim was known by the nickname "Domo."

Mr. Blair testified that he remembered the morning of October 3, 2014. Mr. Blair explained that he called the victim that morning to tell him that he was "fixing to walk to [his] mama's house," who lived at Walter P. According to Mr. Blair, the victim indicated that he wished to accompany Mr. Blair. Mr. Blair stated that he met the victim at the victim's "granny's" house. Mr. Blair said that after meeting the victim, the two decided to walk to Mr. Blair's home. While the two were at Mr. Blair's home, Mr. Blair received a call from a friend named "D" who invited Mr. Blair and the victim to come to his apartment. Later testimony revealed that "D" was a nickname for Adarius Fugate.

Mr. Blair testified that he and the victim arrived at Mr. Fugate's apartment and that Mr. Fugate went inside to use the bathroom while Mr. Blair sat in a chair and the victim sat on the porch. Mr. Blair testified,

> [T]wo or three minutes later, a car rolled down the block, I think it was a silver Acura, and started shooting. I braced myself. I tried to kick the chair back, and I turned around and [the victim] was already gone.

Mr. Blair explained that he heard "six gunshots." The vehicle was an "older model Acura" and was a "silver/beige" color. Mr. Blair claimed that he first noticed the car as "it was creeping up from [his] peripheral, like . . . a split second before it finally like approached [them] coming up the block." Mr. Blair said that the car was driving slowly as it went by at approximately "fifteen . . . miles per hour." Mr. Blair testified that there was a single person in the car, the Defendant. When asked what he saw the Defendant doing, Mr. Blair replied, "He just stopped and looked at us, mugged us, and he started shooting." Mr. Blair said that he "couldn't really see a gun" and that he and the victim were simply "trying to get out of the way."

Mr. Blair testified that prior to the incident on October 3, 2014, he had seen the Defendant. Mr. Blair explained that he "grew up with" the Defendant. Mr. Blair also testified that he was aware that the Defendant had a Twitter account and that the Defendant's Twitter name was RG_LOCO. Mr. Blair said that he knew that the account associated with the name RG_LOCO belonged to the Defendant because it contained a profile picture of the Defendant and "people [were] saying" that the Twitter account

-4-

belonged to the Defendant. Mr. Blair also stated that he was aware that the Defendant was a member of the Crips gang, but he was not sure to which set or branch the Defendant belonged.

Mr. Blair testified that prior to the incident on October 3, 2014, he knew that the victim had a Twitter account. He explained that he knew this because the victim had logged into the victim's Twitter account on Mr. Blair's phone. He also explained that the victim's Twitter account was under the name of DOMO_400 and that the profile picture on that account was a picture of the victim. Mr. Blair stated that he was aware that the victim was a member of the Four Hundred gang and that this was a branch of the Tree Top Piru gang.

Mr. Blair testified that prior to October 3, 2014, he was not aware of the relationship between the Defendant and the victim. However, he conceded that he was aware that "they didn't like each other" and that he had seen "screenshots of their conversations" on social media that indicated the Defendant and the victim had some sort of conflict. Mr. Blair further described the relationship between the Defendant and victim as follows: "It's just basically I don't like you, you don't like me, if I do see you, it's on site, whatever." Mr. Blair said that the term "on site" meant a "fight or anything" and that he could not remember whether the Defendant or the victim posted this phrase on social media.

Counsel for the State showed Mr. Blair a document containing a photograph lineup. Mr. Blair agreed that he circled a picture of the Defendant and signed the photograph. Mr. Blair explained that he identified the Defendant as the shooter at the police department on October 4, 2014.

On cross-examination, Mr. Blair agreed that the shooting occurred in front of the apartment of his friend, Mr. Fugate. Mr. Blair confirmed that on the morning of October 3, 2014, he and the victim went to Mr. Fugate's apartment. Mr. Blair explained that when they arrived, Mr. Fugate went inside the apartment and locked the door, and a few minutes later a car drove by and the shooting began. Mr. Blair confirmed that after the shooting, he called 9-1-1. Mr. Blair admitted that he told the 9-1-1 operator twice that he did not know who the shooter was and claimed that this was "[b]ecause [he] was busy trying to tend to" the victim. Mr. Blair agreed that on October 3, 2014, he accompanied police officers to the station to be questioned about the shooting. Mr. Blair affirmed that he informed the police officers that he saw a "silver Acura" and that it "rolled up and somebody reached out and started shooting." Mr. Blair also agreed that he told the police that he did not know who the shooter was and that the shooting "happened real fast like in a couple of seconds[.]" When asked why he did not tell the police who the shooter was during the initial interview, Mr. Blair responded, "Because I was busy worrying

about my friend dying, . . . and I was still processing stuff in my brain." Mr. Blair confirmed that he went to the police station for a second interview on October 4, 2014.

Michael Allen Mays testified that he was employed as the keeper of the records for Knox County 9-1-1. Mr. Mays explained that 9-1-1 calls were recorded and downloaded on a disc. He said that any call could be produced at any time and that each call had a time and date stamp. Mr. Mays confirmed that he provided the Knoxville Police Department with 9-1-1 calls concerning "the shooting incident on October 3[], 2014, at the Walter P. Taylor Homes." A disc containing three 9-1-1 phone calls was entered into evidence. During one of these calls reporting the shooting at Walter P., Mr. Blair informed the 9-1-1 operator that the shooting occurred on Bethel Avenue. He explained that someone drove by, stopped the car, and shot at him and the victim. The operator asked him twice if he knew who the shooter was, and he said no.

Daesha Johnson testified that she knew the victim because she attended the same high school as the victim and that she was familiar with his family. Ms. Johnson identified the Defendant in the courtroom and testified that prior to October 3, 2014, she knew the Defendant because he had previously dated one of her friends. Ms. Johnson said that she was aware that the victim had a Facebook account and that she knew a specific account belonged to him "[b]ecause [the victim] would post videos when he woke, you know, just videos or pictures of him where he graduated, things of that matter." Ms. Johnson testified that she knew the Defendant had a Facebook account "through a friend and then when [she] first [saw] where [the Defendant] directed something towards [the victim]." She confirmed that there were "selfies" of the Defendant on that Facebook account. Ms. Johnson testified that she was aware the Defendant was a member of the Crips gang, but she did not know if the victim had been a member of a gang.

Ms. Johnson offered additional testimony regarding the photographs posted on the Defendant's and victim's Facebook pages. Ms. Johnson explained that the Defendant and the victim were associated with different neighborhoods and that there were "photographs being taken in each other's neighborhoods." She testified that she had viewed a photograph on the Defendant's Facebook page of the Defendant "in front of the sign" at Walter P. Ms. Johnson said that the Defendant appeared to be "set tripping" and that set tripping was "a Blood and a Crip thing." Ms. Johnson stated that she was not aware of the relationship between the Defendant and the victim.

Ms. Johnson testified that she was at Walter P. on October 3, 2014. She claimed that she saw the Defendant "in the area, Walter P., with a gun." She explained that she was located in "Parking Lot L" when she saw the Defendant with a gun. She said that he was "carry[ing] a pistol" and was walking "[t]owards [the victim]." Ms. Johnson said

-6-

that a few minutes after she observed the Defendant walking, she heard "[g]unfire, shots." She said that when she heard the gunfire, she was leaving Walter P. and saw "a gray Acura, four door" that was "flying down Bethel" Avenue. Ms. Johnson testified that she did not see the gunfire, but she could tell that it was coming from the direction of Bethel Avenue. Ms. Johnson confirmed that she did not see the Defendant shoot a gun and that after she saw the Defendant with a gun, she did not know where he went. Ms. Johnson testified that after hearing the gunshots and seeing the vehicle, she called someone to determine what had happened and learned that the victim had been shot.

On cross-examination, Ms. Johnson agreed that she went to the police station on October 12, 2014, to discuss the incident at Walter P. on October 3, 2014. She confirmed that when she attempted to identify the Defendant in a line-up at the police station, she was not sure if the Defendant was the man she saw on October 3, 2014. However, during the trial, Ms. Johnson identified the Defendant as the man she saw that day and testified that he was wearing "a dark-colored hoody" without a hat. She explained that she told the police she "wasn't sure" because she "didn't want to be a part of anything" and because she "didn't witness [the Defendant] shoot [the victim]." Ms. Johnson also stated that she did not want to be involved in this case because the Defendant was a gang member. Ms. Johnson confirmed that she saw the Defendant walking toward the victim with a gun in "a neighborhood where [the Defendant did not] belong." Ms. Johnson stated that she did not speak to the police on the day of the shooting because she was unaware that "there was an argument" between the victim and the Defendant. She explained that she originally believed the Defendant had his gun in hand "because he was walking through a neighborhood that wasn't his."

Ulysses Cameron testified that he was from Knoxville and that he was familiar with the Defendant. Mr. Cameron said that on October 3, 2014, he and his uncle drove by Walter P. on their way home and noticed that "there were police everywhere." When asked what happened after that, Mr. Cameron responded,

> I got on Facebook and . . . [there] was a lot of talk on Facebook, so you know. That's – [the Defendant], that's a friend of mine. You know, he ran with my little brother. You know, he cool. So you know, when they got . . . [the Defendant's] name out there, . . . I called him, so me and another homie went and picked him up. You know, we was talking to [the Defendant] and just trying to see what was going on, but I mean, . . . he didn't never say that he did nothing. He never said that he killed nobody. He never showed us no gun. No – nothing like that, you know what I'm saying. The whole time when we was talking to him, we was just sitting in the car. You know, he was sitting there beside me. So we rode around for

about fifteen minutes and dropped him off around the corner of my house off Riverside.

Mr. Cameron admitted that he was a member of the Crips gang and affirmed that the Defendant "made representations to [him] that [the Defendant] was with the Crips." Mr. Cameron also confirmed that there were "multiple [tele]phone calls back and forth between [Mr. Cameron] and [the Defendant]" on October 3, 2014. Mr. Cameron testified that he picked up the Defendant at the Defendant's "grandmother's house in South Knoxville" and that while riding in the car with the Defendant he "was trying to figure out what was going on." Mr. Cameron testified that the Defendant revealed to him that "he rode through" Walter P. and that the Defendant said, "some n-----s act[ed] like they wanted to get it crackin'." Mr. Cameron confirmed that the Defendant also made a comment about a gun. Mr. Cameron said,

> [B]eing an older guy, you know, you've got to give them the good side and the bad side, you know what I'm saying. This is what's going to happen, this is what's not, you know what I'm saying. So like I told him, you know what I'm saying, if you didn't, you ain't got nothing to worry about. If that's what happened, you need to get rid of that, you know. So in the midst of that, the question came of how to get rid of the pistol of how do I get rid of a pistol. So with that being said, I told him he should throw it in the river. That's what I would have done.

On cross-examination, Mr. Cameron agreed that he had never seen the Defendant drive a silver Acura nor had he ever known the Defendant to drive a silver Acura.

Timothy Spears testified that he went to high school at Austin-East and that he knew the victim through school. Mr. Spears identified the Defendant and said that he "knew of him." Mr. Spears said that he was aware of the relationship between the victim and the Defendant "[t]hrough Twitter accounts and stuff, and . . . recent conversations with [the victim]." Mr. Spears recalled an incident that occurred at a fair one month before the shooting:

> It was a small incident, nothing severe. I mean, it was pretty harmless. I guess it was a look or two exchanged from each other and at least a sentence. [The victim] had said, what's up, to [the Defendant]. [The Defendant] had said, you know, what's up, back to him, you know. And they both left, parted ways.

Mr. Spears explained that after this exchange, the victim "seemed pretty bothered by what [the Defendant] had said to him. I guess it was the way [the Defendant] had said what's up back to him. It made him feel a little bit shaken."

Regarding information he had gathered through Twitter, Mr. Spears testified that the victim used Mr. Spears's cell phone to log on to the victim's Twitter account. Mr. Spears said that this was how he became aware that the Defendant also had a Twitter account. Mr. Spears stated that he never saw any photographs on either of these Twitter accounts. When asked to describe the relationship between the victim and the Defendant based on viewing these social media accounts, Mr. Spears said, "From me reading different posts and stuff before they got deleted, it was pretty apparent to me that they didn't really like each other all that much." He said that he specifically recalled "one day on Twitter, [the victim was] talking about his little brother, and [the victim] had told [Mr. Spears] that [the Defendant] had said something about his brother and it made [the victim] mad." Mr. Spears explained that he looked at Twitter and was only able to read the victim's post.

Russ Whitfield testified that he was employed in the forensic unit of the Knoxville City Police Department. He explained that he primarily worked crime scenes and recalled receiving a service call "to go to Walter P." on October 3, 2014. Officer Whitfield explained that after arriving at the scene, he discussed the case with the responding patrol officers. Officer Whitfield observed that someone had covered the victim's body with a blue sheet and noticed that there were spent shell casings on the ground, which he "marked with yellow placards" and then "photographed the general area." After photographing the scene, Officer Whitfield returned to the Knoxville Police Department and contacted the "maintenance shop for the vehicles" where "spent bullets" were recovered "from a red Volkswagen" located near the apartment porch where the victim was shot. Officer Whitfield said that he went to the UT Forensic Center where he "picked up a spent bullet that was recovered during the autopsy" of the victim. The prosecutor then showed Officer Whitfield multiple photographs of the crime scene at Walter P., which were then entered into evidence. The photographs included images of a silver Nissan van though which a bullet had passed, a red Volkswagen with a bullet hole on "the left rear passenger door[,]" spent shell casings, the victim covered with a blue sheet, the victim uncovered, and photographs of the apartment and general area of the crime scene.

Patricia M. Resig stated that she was employed with the Knoxville Police Department as a firearms examiner assigned to the forensic unit and testified as an expert in firearms. She explained that a firearms examiner "examines guns, bullets, and cartridge cases, and other ammunition components that have been involved in a crime." Ms. Resig testified that she examined cartridge cases found at the scene and after analyzing them, concluded that "these six cartridge cases were fired from the same unknown gun" and that the type of gun would have been "a 40 Smith and Wesson caliber."

Jeremy Maupin testified that he was employed as an investigator in the violent crimes unit for the Knoxville Police Department. He stated that he was working on October 3, 2014, and that he received a call to respond to Walter P. Investigator Maupin explained that after arriving at Walter P., he observed that "the crime lab had already responded and was already putting placards out and processing the scene." Investigator Maupin also observed "the victim, . . . deceased on the front porch." He explained that he was selected to lead the investigation and that he "started trying to gather" information.

Investigator Maupin ascertained that Mr. Blair and Mr. Fugate were on the scene during the shooting and that he "had them transported to the police department so [he] could interview them later." Investigator Maupin stated that while he continued to investigate the crime scene, he sent two of his partners, Investigator Riddle and Investigator Wardlaw, to "go ahead and proceed trying to get as much information" from Mr. Blair and Mr. Fugate. Investigator Maupin said that he returned to the police station and that the investigators had obtained the name of the Defendant by interviewing Mr. Blair and Mr. Fugate. Investigator Maupin explained that they "started gathering up information on [the Defendant] and pulling his photograph and any and all addresses, any and all vehicles that attached to him, and all his family members." He testified that he also searched for a silver Acura but was unsuccessful in locating one.

Investigator Maupin returned to the crime scene for further investigation to "try to talk to some neighbors trying to find out any information." Investigator Maupin said that after speaking with family members and neighbors at the crime scene, he "got some tips, call-ins, some anonymous tips c[a]me in [regarding] who might have been involved." He said that through this investigation, the Defendant and another individual were named as potential suspects.

Investigator Maupin testified that on October 4, 2014, he brought Mr. Blair back to the police station for another interview. He stated that he presented Mr. Blair with a photograph lineup and that Mr. Blair "immediately picked out" the Defendant. Investigator Maupin also talked with the Defendant after the Defendant's mother contacted Investigator Maupin and brought the Defendant to the police station to be interviewed. When asked what type of information he was trying to obtain from the Defendant in this interview, Investigator Maupin responded that he "wanted to nail down an alibi" for the Defendant. Investigator Maupin asked the Defendant whether he had a cell phone and that the Defendant denied having a cell phone. Investigator Maupin said that the Defendant told him that he "knew of [the victim] . . . but that was it[.]" Furthermore, Investigator Maupin said that the Defendant denied having any conflict with the victim or having problems with the victim "on any social media, Facebook, [or]

-10-

Twitter[.]" The State introduced a video of this police interview with the Defendant and played a portion of it for the jury.

Following this interview with the Defendant, Investigator Maupin attempted to corroborate the Defendant's statement. Investigator Maupin "followed up with all the places that [the Defendant] said he went, who saw him at those locations, also verified if he had a phone or not and started interviewing those individuals." Investigator Maupin said that he was able to "strongly discount [the Defendant's] alibi." Investigator Maupin determined that the Defendant did have a cell phone and obtained cell phone records for that phone. Investigator Maupin confirmed that during the interview, the Defendant "invite[d] him to look at his Facebook account" and denied owning a gun. Investigator Maupin also testified that he subpoenaed records from Twitter regarding the Defendant's account.

In a jury-out hearing, the Defendant objected to allowing the introduction of these records, arguing that it was not possible to establish the authenticity of the records. Defense counsel did not dispute that the records presented were records from Twitter, but he argued that these records could not be "authentically tied to" the Defendant. Additionally, defense counsel argued that Investigator Maupin was "not qualified to decipher" the Twitter records. The trial court ruled that the State was permitted "to introduce [the Twitter] records" through Investigator Maupin but that "he [was] not to interpret the records."

Investigator Maupin testified that during his investigation, he learned that the Defendant had a Twitter account. He stated that an account with the name RG_LOCO belonged to the Defendant and that an account with the name DOMO_400 belonged to the victim. Investigator Maupin identified Twitter records associated with the two accounts, and he testified that on RG_LOCO's account there were references to the victim. When asked to read from the Defendant's Twitter records, Investigator Maupin read the following statements:

- "I lied to @DOMO_400, haha."
- "Domo n Kip r weenies, dey dnt got s--t on me n chaos. We put in real wax. Dey get treated lik lil n------z by they homies, nun but respect dis way."
- "@DOMO_400: @raakiaa sound like a set-up."
- "@DOMO_400: @raaakiaa rakia u cNx C xrussed no more."
- "@DOMO_400" and a link to a website
- "@DOMO_yolo_Gray" and a link to a website
- "I think I might have to beat on Domo if still here during class change, IDGAF, I've got some s—t I need to get off my chest."

-11-

- "Dis 40 cal gunna fold you."
- "400 say they going to kill me, but if they waiting on me to die too die, they going to see me waiting for a minute."
- "Renegade loc da 1 minute army, #10toesdown."
- "I'm going to the East Side. Who going to c in Walter C.??????"
- "St8, straight, drop dis in zip locc dat right on my waistline is where I kept dat strap."

The Prosecutor also asked Investigator Maupin about his knowledge regarding gang activity in Knoxville. He responded that the Tree Top Pirus gang was a "set under the East Side or Blood Nation" and that there were a number of Tree Top Pirus members "in the Walter P. area" of East Knoxville. He said that another name for this gang was the "Tree Tops 400." Investigator Maupin also explained that there were "a whole lot of different sets of Crips" located in South Knoxville. Investigator Maupin was able to view photographs related to the Defendant's Twitter account and that in one photograph "it appear[ed] to be [the Defendant] wearing a baby blue North Carolina hat doing what [Investigator Maupin knew] to be a gang sign."

On cross-examination, Investigator Maupin stressed that he thoroughly investigated this case. He recalled that Mr. Fugate told him that he was inside using the bathroom during the shooting. Investigator Maupin admitted that "it did sound odd at first, but when [he] found out that there w[ere] actually feces in the toilet right after the shooting, it made [him] believe that [Mr. Fugate] really did go in to use the bathroom."

Dr. Christopher Lochmuller stated that he was the chief deputy medical examiner at the Knox County Regional Forensic Center and testified as an expert in forensic pathology. Dr. Lochmuller said that he performed an autopsy on the victim and determined that the victim's cause of death was "a gunshot wound to the chest" and that the manner of the victim's death was homicide.

At the conclusion of the trial, the jury convicted the Defendant of first degree murder, attempted first degree murder, and employing a firearm during the commission of a dangerous felony. The Defendant was sentenced to life in prison for the first degree murder conviction. He was sentenced to fifteen years' incarceration for the attempted first degree murder conviction and six years' incarceration for the conviction of employing a firearm during the commission of a dangerous felony, which sentences were to be served consecutively to one another but concurrently with his life sentence. The trial court denied the Defendant's motion for a new trial, and he filed a timely appeal with this court.

## ANALYSIS

*I. Sufficiency*

On appeal, the Defendant argues that the evidence was insufficient to support his convictions. Specifically, he argues that the testimony of "Devonte Blair and Daesha Johnson was not sufficiently credible for a reasonable jury to find the [Defendant] guilty beyond a reasonable doubt." Furthermore, the Defendant argues that the evidence was insufficient to "establish premeditation beyond a reasonable doubt with regard to either" the victim or Mr. Blair. According to the Defendant, if he had been at Walter P. on the morning of the shooting, then "he would still not have a basis to know exactly where [the victim] and [Mr.] Blair would happen to be at 10:30 in the morning." The Defendant also contends that none of the social media evidence provides "a basis for why either [Mr.] Blair or [the victim] would be targeted by the [Defendant] for a murder." The State responds that the evidence was sufficient for the jury to find that the Defendant was guilty of first degree murder and attempted first degree murder. Specifically, the State argues that a "jury's verdict . . . resolves all conflicts in favor of the State, and this [c]ourt has repeatedly held that it will not usurp the jury's credibility determinations." We agree with the State.

An appellate court's standard of review when the Defendant questions the sufficiency of the evidence on appeal is "whether, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id., State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

"Direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference[.]" Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal

-13-

of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As relevant here, "[f]irst degree murder is . . . a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a). Premeditation is

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d).

The element of premeditation is a factual question to be decided by a jury from all the circumstances surrounding the killing. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although a jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors demonstrating the existence of premeditation include, but are not limited to, the following: the declaration of the intent to kill, the procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, the infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, the destruction or secretion of evidence, and calmness immediately after the killing. State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000). Additional factors cited by this court from which a jury may infer premeditation include lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). Further, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

"A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense[,] . . . [a]cts with intent to complete a course of action or cause a result that would otherwise constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3). Furthermore, "[i]t is an offense to employ a firearm during the [c]ommission of a dangerous felony." Tenn. Code Ann. § 39-17-1324(b). "Dangerous felony means

-14-

[a]ttempt to commit first degree murder, as defined in §§ 39-12-101 and 39-13-202." Id. § (i)(1)(A).

The identity of the perpetrator is an essential element of any crime. State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)).

Here, there is sufficient proof to support the Defendant's convictions for first degree murder and attempted first degree murder. Mr. Blair identified the Defendant as the man who shot at him and who killed the victim. Ms. Johnson testified that shortly before the shooting, she observed the Defendant walking through a parking lot at Walter P. carrying a gun, a neighborhood to which she claimed that he did not belong. Mr. Cameron testified that soon after the shooting, he picked up the Defendant in his vehicle, and the Defendant asked him how to get rid of a gun. When Investigator Maupin attempted to verify the Defendant's alibi for the morning of October 3, 2014, he was able to "strongly discount it." Additionally, Investigator Maupin discovered that the Defendant owned a cell phone, despite his denying having one. The medical examiner determined that the victim died because of a gunshot wound, and the firearms examiner testified that the type of gun was "a 40 Smith and Wesson caliber." One of the Defendant's Twitter posts said, "Dis 40 cal gunna fold you."

Furthermore, there is sufficient evidence that the Defendant acted with premeditation with regards to the victim and Mr. Blair. The Defendant shot at both men from a car while the victim and Mr. Blair were seated on an apartment porch. Both the victim and Mr. Blair were unarmed. Mr. Blair testified that the Defendant drove by in a silver Acura, "stopped and looked at [the victim and Mr. Blair], mugged [them], and he started shooting." The Defendant shot at both men multiple times, as evidenced by the spent shell casings found at the scene near the porch on which the victim and Mr. Blair were sitting.

Moreover, Mr. Blair and Mr. Spears testified that there was some sort of conflict between the Defendant and the victim. Also, Investigator Maupin testified that the Defendant's Twitter records revealed references to a conflict between the Defendant and the victim. In one such post, the Defendant wrote that he "might have to beat on

-15-

Domo[,]" which was a nickname for the victim. Furthermore, several witnesses testified that the Defendant and the victim were members of separate gangs. This included Investigator Maupin, who testified that the Defendant and the victim were members of different gangs and that he discovered evidence of conflict between the two men.

The proof is also sufficient to support the Defendant's conviction for employing a firearm during the commission of a dangerous felony. As previously discussed, there is ample evidence to establish that the Defendant committed attempted first degree murder of Mr. Blair. Furthermore, there is sufficient evidence that the Defendant used a firearm during the attempted first degree murder. Mr. Blair testified that the Defendant shot at him, and Ms. Johnson saw the Defendant with a gun near the scene of the crime shortly before the shooting. Also, there was testimony regarding spent shell casings found at the scene.

There is sufficient evidence to identify the Defendant as the perpetrator of first degree murder, attempted first degree murder, and employing a firearm during the commission of a dangerous felony. Furthermore, the proof established that the Defendant acted intentionally and with premeditation when he shot at both the victim and Mr. Blair. Thus, the Defendant is not entitled to relief on this issue.

*II. Authentication*

The Defendant argues that the trial court should have excluded witnesses' testimony regarding what they learned from viewing social media content.[2] Specifically, the Defendant argues that the social media comments cannot conclusively be attributed to the Defendant. Furthermore, the Defendant contends that this case is distinguishable from the facts of <u>State v. Vermaine M. Burns</u>, No. M2914-00357-CCA-R3-CD, 2015 WL 2105543 (Tenn. Crim. App. May 5, 2015) (holding that there was sufficient circumstantial evidence to authenticate Facebook chats and email). The State responds that there was sufficient evidence to authenticate the social media posts and attribute them to the Defendant. We agree with the State.

Tennessee Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Evidence may be authenticated through "[t]estimony that a matter is what it is claimed to be" or "[a]ppearance, contents,

---

[2] The Defendant separates the witnesses' testimony regarding social media and the Twitter records into two separate issues, but we will address the admissibility of this evidence together.

-16-

substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Tenn. R. Evid. 901(b)(1), (4).

In Melissa L. Bright Dockery v. Kevin Carl Dockery, Sr., No. E2009-01059-COA-R3-CV, 2009 WL 3486662 (Tenn. Ct. App. Oct. 29, 2009), the Court of Appeals held that MySpace messages were properly admitted at trial when the messages were sent from the defendant to his friend, Ms. Lowe, and she had subsequently printed out their conversation. Ms. Lowe testified that she printed the messages directly from her computer and stated that the "printouts showed exactly what [the defendant] said, as well as what she said." Dockery, 2009 WL 3486662, at *6.

Furthermore, a panel of this court has addressed the issue of authenticating evidence found on social media websites. See Burns, 2015 WL 2105543. In that case, the defendant argued that Facebook chats and emails containing a photo of a penis were not properly authenticated "because the State failed to exclude the possibility that someone else authored the messages." Id. at *10. In analyzing the issue, the Burns court considered cases from several other jurisdictions, who dealt with similar authentication issues regarding social media. Id. at *11-12.

For example, in Griffin v. State, 19 A.3d 415 (Md. 2011), the Court of Appeals of Maryland recognized the difficulties regarding authenticating evidence from social media when analyzing whether the prosecution had authenticated printouts from the defendant's girlfriend's MySpace profile, which allegedly contained a threat to one of the State's witnesses: "The concern arises because anyone can create a fictitious account and masquerade under another person's name or can gain access to another's account by obtaining the username and password." Id. at 421. The Court of Appeals of Maryland held that the "picture of [the defendant's girlfriend], coupled with her birth date and location, were not sufficient 'distinctive characteristics' on a MySpace profile to authenticate its printout, given the prospect that someone other than [the Defendant's girlfriend] could have not only created the site, but also posted the [purported threat]." Id. at 424. The Court of Appeals of Maryland offered the following example as a possible manner by which such evidence could be authenticated: "search the computer of the person who allegedly created the profile and posting and examine the computer's internet history and hard drive to determine whether that computer was used to originate the social network profile and posting in question." Id. at 427.

Determining whether social media evidence has been authenticated requires fact specific analysis. The Burns court noted several other cases from other jurisdictions that held that evidence from social media and emails was authenticated when the prosecution offered corroborating circumstantial evidence. See In re F.P., 878 A.2d 91 (Pa. 2005) (holding that transcripts of instant messages between the defendant and the victim were

-17-

properly authenticated after considering the following facts: the defendant identified himself by first name and threatened physical violence against the victim in the transcripts, the victim reported the threats to school authorities, staff at the school met with the defendant regarding the threats, the defendant sent another instant message regarding that school meeting, and the defendant's brother testified that he saw the defendant assault the victim); Commonwealth v. Purdy, 945 N.E.2d 372 (Mass. 2011) (holding that email exchanges initiated from the defendant's email account, containing the defendant's name, found on the hard drive of the defendant's computer were properly authenticated); People v. Clevenstine, 891 N.Y.S.2d 511, 514 (N.Y. App. Div. 2009) (holding that sexually explicit MySpace instant message communications between the defendant and the victims were properly authenticated when both victims testified they had discussed sexually explicit topics via MySpace with the defendant, police recovered copies of these conversations from the hard drive of one of the victim's computers, the defendant's wife testified that she found such conversations on the defendant's MySpace account, and a representative from MySpace testified that the accounts in question were created by the victims and the defendant); Tienda v. State, 358 S.W.3d 633, 642-45 (Tex. Crim. App. 2012) (holding circumstantial evidence was sufficient to authenticate evidence from MySpace postings). Additionally, in Tienda, the Texas Court of Criminal Appeals responded to the defendant's argument that the prosecution was unable to authenticate that the MySpace postings were tied to the defendant:

> Conceivably some unknown malefactors somehow stole the appellant's numerous self-portrait photographs, concocted boastful messages about David Valadez's murder and the circumstances of that shooting, was aware of the music played at Valadez's funeral, knew when the appellant was released on pretrial bond with electronic monitoring and referenced to that year-long event along with stealing the photograph of the grinning appellant lounging in his chair while wearing his ankle monitor. But that is an alternate scenario whose likelihood and weight the jury was entitled to assess once the State had produced prima facie showing that it was the appellant, not some unidentified conspirators or fraud artists, who created and maintained these MySpace pages.

Id. at 646.

In Burns, this court compared the facts of that case to the facts of these cases from other jurisdictions and concluded that there was "sufficient circumstantial evidence to authenticate the Facebook chats and emails in question." Id. at *12. In its analysis, this court considered the following facts: "[t]he [d]efendant admitted that the Facebook account used to send the chats belonged to him"; the investigating detective "independently verified that the Facebook account belonged to the [d]efendant by

-18-

comparing the Facebook profile picture, user ID number, and associated email address with those of the Facebook account that sent chats to [the victim]"; and "[t]ranscripts of the 'exact' same chats were found on both the [d]efendant's and the victim's computer hard drives." Id. Furthermore,

> [w]ith regard to the emailed photographs, the [d]efendant admitted that the Hotmail account belonged to him and that the password to the account was not "remembered," requiring someone to enter a password each time they logged into the account. Further, it was the same email address to which the sender instructed [the victim] to send photos. The Hotmail email address was also associated with the [d]efendant's Facebook account and tied to the T-Mobile Blackberry. Additionally, the same Hotmail account was open when police executed the search warrant, and the Hotmail email address was listed on the [d]efendant's résumé. Photos sent via email by [the victim] were found on the [d]efendant's computer, and the photo of a black man's penis was found on the [d]efendant's Blackberry, as well as [the victim's] computer hard drive. The time-date stamps of the photos matched the times the chats were sent to their respective recipients.

Id.

The court in Burns held that "[t]o the extent that the [d]efendant argues that the State was required to affirmatively prove that the [d]efendant was the author of the message, we agree with reasoning from other jurisdictions that such challenge goes to the weight of the evidence, not its admissibility." Id. (citing Tienda, 358 S.W.3d at 646; Purdy, 945 N.E.2d at 381-82; Clevenstine, 891 N.Y.S.2d at 514).

Here, multiple witnesses testified that the evidence obtained from social media was clearly tied to the Defendant. Mr. Blair testified that he knew the Defendant had a Twitter account and that he knew this account to be under the name of RG_LOCO because the account had a profile picture of the Defendant and others had told him that this account belonged to the Defendant. Mr. Blair also testified that he knew the victim had a Twitter account under the name of DOMO_400 because the victim had used Mr. Blair's phone to log on to Twitter the morning of the shooting. Mr. Blair was also confident that this account belonged to the victim because he knew the victim to be a member of the Tree Top 400 gang. Also, Mr. Blair saw a screenshot of a social media posts indicating that the Defendant and the victim possessed animosity towards each other. Ms. Johnson testified that based upon posts and self-photographs she had seen on Facebook, she knew that both the Defendant and the victim had active Facebook accounts. Specifically, she testified that she saw a picture of the Defendant posed in front

-19-

of the Walter P. sign posted on his Facebook page. Mr. Cameron testified that on the morning of the shooting, he looked on Facebook and discovered that the Defendant might have been in the Walter P. area. It was after Mr. Cameron discovered this information on Facebook that he called the Defendant and asked if he needed a ride.

Mr. Spears testified that he was aware of the conflict between the Defendant and the victim through "Twitter and stuff" and "recent conversations" with the victim. Mr. Spears said that the victim used Mr. Spears phone to log on to Twitter, and that after this, Mr. Spears knew that the victim had a Twitter account. Mr. Spears stated that he also saw Twitter posts from the Defendant. Additionally, he recalled an incident about one month prior to the shooting in which the Defendant and the victim encountered each other at a fair, and the victim appeared to be "shaken" after the altercation.

Finally, Investigator Maupin testified that during his investigation, he learned that the Defendant had a Twitter account under the username RG_LOCO and that the victim had a Twitter account using the name DOMO_400. Investigator Maupin subpoenaed Twitter records associated with these accounts and found multiple posts by RG_LOCO corroborating the evidence that the Defendant and the victim were each members of rival gangs and that there was hostility between them. The Defendant had an opportunity to cross-examine each of these witnesses, and counsel for the defense argued that due to the nature of electronics and social media, someone other than the Defendant could have made these social media posts. However, we agree with the Burns court and hold that this is a matter of the weight of the evidence. Accordingly, we conclude that there was circumstantial evidence to authenticate the Twitter records and the witnesses' testimony regarding Facebook and Twitter accounts.

### III. Admissibility

Additionally, the Defendant argues that the Twitter records and testimony regarding what witnesses observed on social media were inadmissible under Tennessee Rule of Evidence 403. The State responds that the evidence obtained from social media was not substantially outweighed by the danger of unfair prejudice. We agree with the State.

The general admissibility of evidence is governed by Tennessee Rules of Evidence 401 and 403. Under these rules, the trial court must determine, first, whether the evidence offered is relevant. Tenn. R. Evid. 401. Evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Although relevant evidence is generally admissible, see Tennessee Rule of Evidence 402, it "may be excluded if its probative value is

-20-

substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence[.]"  See Tenn. R. Evid. 403; State v. Banks, 564 S.W.2d 947, 950-51 (Tenn. 1978).

The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 950-51.  This court has also stated that "[p]rejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'"  State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quoting M. Graham, Handbook of Federal Evidence, 182-83 (2d ed. 1986)).

Here, the trial court determined that this evidence was relevant and not unduly prejudicial.  While evidence that the Defendant had a conflict with the victim in his homicide trial is damaging to the Defendant, it is not unduly prejudicial.  Such evidence established the relationship between the Defendant and the victim and premeditation.  We conclude that the trial court cannot be said to have abused its discretion by admitting the Twitter records and social media testimony into evidence.  We agree that the probative value of this evidence was not substantially outweighed by its danger of unfair prejudice. Accordingly, the Defendant is denied any relief on this issue.

## CONCLUSION

Based upon consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____

D. KELLY THOMAS, JR., JUDGE

-21-